**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHRISTINE ROBINS and NATHAN FENWICK,<br><br>*Plaintiffs,*<br><br>v.<br><br>CENTRE LANE PARTNERS, LLC; IB APPLIANCES US HOLDINGS, LLC; ANCHOR HOCKING, LLC; MAYANK SINGH; ANNETTE NG; QUINN MORGAN; RICHARD KRAUSE; and JAMIE KELLER,<br><br>*Defendants.* | C.A. No.<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs Christine Robins ("Robins") and Nathan Fenwick ("Fenwick") bring this action against Defendants Centre Lane Partners, LLC ("Centre Lane"), IB Appliances US Holdings, LLC ("Instant Pot" or the "Company"), Anchor Hocking, LLC ("Anchor Hocking"), Mayank Singh ("Singh"), Annette Ng ("Ng"), Quinn Morgan ("Morgan"), Richard Krause ("Krause"), and Jamie Keller ("Keller") for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.*, and other laws. In support of their claims, Plaintiffs allege as follows:

**INTRODUCTION**

1.      This is a case about private equity firm Centre Lane conspiring with two of its portfolio companies and people it installed on their Boards of Directors to commit financial crimes—then ousting two executives who refused to participate in the criminal enterprise.

2.      Plaintiffs Robins and Fenwick served as the CEO and CFO, respectively, of Centre Lane portfolio company Instant Pot, a well-known brand in kitchen appliances.

1

3.      Instant Pot began to grapple with cash flow issues in the second half of 2025—due in large part to one-time issues, including a substantial settlement payment, tariff obligations, and the requirement by Customs and Border Patrol to post new bonds as collateral for increasing tariff amounts.  All payments were made at the direction of Centre Lane over the course of months.  By September 2025, Plaintiffs were vocal in expressing concern about the Company's cash position to Defendants Ng, Krause, Singh, and Morgan.

4.      But Defendants were dismissive of Plaintiffs' concerns about liquidity.  For months, Defendants ignored concerns raised weekly about the Company's cash issues and repeatedly told Plaintiffs to pay out one-time lump sums that only worsened the situation.  In early January 2026, Plaintiff Robins urged Chairman Krause to convene a Board meeting with all Board members (including non-Centre Lane Directors) to review the cash flow situation.  At this point, only select Centre Lane Directors were informed of the cash constraints, not the full Board.  When Krause indicated to Defendant Morgan (a Centre Lane Co-Founder) that a full Board meeting should be convened to discuss the budget and cash outlook, Morgan shot Krause down.  Morgan instead stated Instant Pot's "major shareholder and Board member is notified," so there was "no need for a Board meeting."  Morgan was thinking only of Centre Lane's interests, despite also being a director of Instant Pot with fiduciary duties to the Company and all Board members.

5.      By January 2026, the Company's cash situation had become dire due to the string of one-time cash outlays at Centre Lane's direction, though the Company was commercially healthy—returning to number one market share position after years, delivering revenue growth in excess of the market, and establishing strong profit expansion after a carve-out in 2023.

6.       Defendants resorted to engaging in fraudulent, criminal acts intended to solve the cash problem, including:

    a.     Using third party custodial cash—legally owned by a third party investment company ("Lender")—received by Defendant Anchor Hocking on behalf of Instant Pot to pay for Anchor Hocking operating expenses instead of returning the cash to the third party's custodial account managed by Instant Pot for transmission to Lender;

    b.     Demanding that the Plaintiffs use funds held in the third party's custodial account to pay for the operational expenses of Instant Pot, despite being put on notice that such misappropriation is unlawful;

    c.     Manipulating the Company's projections, which had been solidified over the course of months and approved by Defendants Singh, Krause, Ng and Centre Lane, to seek funding from—and possibly a sale of the Company to—a strategic investor that owned nearly 30% of the Company; and

    d.     Withholding key information regarding the Company's cash position from interested parties, including the Company's 30% strategic owner and the director it put on the Company's Board.

7.       These unlawful acts were orchestrated by Defendant Singh, a Centre Lane Managing Director with major influence across Centre Lane's network of companies.  But Singh did not commit these crimes alone: he had active support from his co-conspirators, Defendants Ng, Krause, Keller, and Morgan.

8.       Plaintiffs Robins and Fenwick were unwilling and refused to aid and abet the fraudulent scheme: they repeatedly objected to these activities in calls, meetings, and e-mails with various Defendants.

9.       Defendants tried to bully them into submission.  For example, when Plaintiff Fenwick wrote to Defendants Singh, Ng, and Krause on January 24, 2026, that Instant Pot could not siphon funds from a custodial account to pay Instant Pot's vendors, Defendant Singh lashed out: "I HAVE ASKED YOU TO MAKE VENDOR PAYMENTS AS I LAID OUT…AND I

EXPECT THE SAME FOR MONDAY."  He added, "I AM NOT ASKING FOR PERMISSION" and "NEXT TIME WE HAVE A CONVERSATION, I EXPECT YOU TO DO AS I SAY."

10.     But Robins and Fenwick did not relent.  They refused to pay Company vendors with custodial funds owned by the Lender and raised complaints with Chairman Krause, the Head of Human Resources, and others.

11.     It was clear by this point that Plaintiffs knew too much.  On January 27, 2026—on the heels of reporting numerous times to HR about the ethical violations and criminal demands being made by Singh, and notification by Fenwick to Board Chairman Krause that Fenwick was working to provide a reconciliation of all third party custodial funds as demanded by the third party lender—both Robins and Fenwick were locked out of all Company systems.  Immediately after, Singh told Robins and Fenwick that they were suspended from the Company pending an investigation.

12.     Defendant Singh then confirmed both suspensions by e-mail.  He directed Plaintiffs to immediately cease all work on behalf of the Company and indicated that the Company was investigating *their* conduct.  Plaintiff Robins was specifically instructed not to talk to the third party Lender.  The purported "investigation" was a transparent pretext for the Company's retaliation against Plaintiffs for refusing to support a criminal scheme.  Plaintiffs remained on paid leave for five months after the commencement of the "investigation," with no communication from the Company.  During this time, the Company was obligated to notify Plaintiffs of the outcome of any investigation within 15 days of notice of such investigation, but failed to do so, stringing the purported "investigation" out for five months, with little to no communication, forcing Plaintiffs to engage counsel.

4

13.     As detailed below, Plaintiffs sent numerous letters seeking information about the purported basis for the investigation, as well as copies of any policies or procedures they supposedly violated.  They also demanded advancement and indemnification of legal fees they are incurring as a result of the legal chaos Defendants created for them.

14.     The Company has yet to meaningfully respond to the demands in any of these letters or provide more than token information on the status of the investigation, only providing skeletal, trivial information in late April.  Nor did the Company provide information on the demands for advancement and indemnification of legal expenses, other than informing Plaintiffs, through counsel, that the Company is refusing to indemnify them.  And they have failed to provide written notice of any cause that could possibly justify termination, as required by Plaintiffs' employment agreements—hence the indefinite investigation limbo in which Instant Pot instead placed Plaintiffs.

15.     Post-suspension, the first communication Plaintiffs have had with their former employer was on June 18, 2026, when Chairman Krause called Plaintiff Robins to threaten her and Fenwick not to file suit, claiming that if they did so, Defendants would do everything in their power to drag the lawsuit on for years, drive up legal fees and make Plaintiffs pay for them, and otherwise make it more difficult for Plaintiffs to find future employment.

16.     The second communication came the next day, on June 19, 2026, when Plaintiffs were officially terminated from their positions **without cause**.

17.     Plaintiffs have been left in a completely untenable position—for many reasons— and thus resort to judicial intervention.

## PARTIES

18.     Plaintiff Christine Robins was, at all relevant times, actively employed as the CEO of Instant Pot Brands ("the Company").  As discussed below, Robins was suspended and ultimately terminated—and replaced with a new CEO—in retaliation for refusing to engage in and then reporting unlawful activity.  Robins' primary residence is in Boca Raton, Florida.

19.     Plaintiff Nathan Fenwick was, at all relevant times, actively employed as the CFO of the Company.  As discussed below, Fenwick was suspended and ultimately terminated—and replaced with a new CFO (who, on information and belief, is also a direct employee of Centre Lane)—in retaliation for refusing to engage in and then reporting unlawful activity.  Fenwick resides in Cornelius, North Carolina.

20.     Defendant Centre Lane Partners, LLC is a limited liability company organized under the laws of the State of Delaware whose principal place of business is located at 60 East 42nd Street, Suite 2220, New York, New York 10165.

21.     Defendant IB Appliances US Holdings, LLC is a Delaware limited liability company with its principal place of business at 8725 W Higgins Road, Suite 725, Chicago, Illinois 60631.  It is a subsidiary of IB Appliances Intermediate Holdings, LLC.

22.     Defendant Anchor Hocking, LLC is a Delaware limited liability company with its principal place of business at 1600 Dublin Road, Suite 200, Columbus, Ohio 43215.

23.     Defendant Mayank Singh is a Managing Director of Centre Lane.  Defendant Singh resides at 313 East Palmetto Park Road, Apt. 501, Boca Raton, Florida 33432. Mr. Singh also maintains a residence at 111 Murray Street, Unit 8W, New York, New York 10007.

24. Defendant Annette Ng is a Vice President of Centre Lane and a Director of IB Appliances US Holdings, LLC. Defendant Ng resides at 411 East 57th Street, Apartment 11E, New York, New York 10022.

25. Defendant Quinn Morgan is a co-founder and principal of Centre Lane. Defendant Morgan resides at 1815 Michigan Ave., Miami Beach, Florida 33139. Mr. Morgan also maintains a residence at 8 East 10th St., Apt. 4, New York, New York 10003.

26. Defendant Richard Krause is the Chairman of the Board of Directors of IB Appliances US Holdings, LLC. Defendant Krause resides at 4875 Pelican Colony Boulevard, Apartment 1001, Bonita Springs, Florida 34134.

27. Defendant Jamie Keller is the CFO of Anchor Hocking. Mr. Keller resides at 7555 Bridlespur Lane, Delaware, Ohio 43015.

## JURISDICTION AND VENUE

28. This Court has original jurisdiction to hear the claims pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1331, and 28 U.S.C. § 1338.

29. This Court has supplemental jurisdiction over the state law claims asserted here under 28 U.S.C. § 1367, as they arise from the same nucleus of fact as the other claims.

30. Venue is proper in this Court under 28 U.S.C. § 1391, given the residences of certain Defendants identified above and provisions in relevant contracts pointing to Delaware.

## FACTUAL ALLEGATIONS

**A.     Plaintiffs Agree to Serve as Officers of Instant Pot and Perform with Distinction—on Terms the Company Would Later Refuse to Honor.**

31. Robins entered into an Employment Agreement with the Company on or around January 2, 2024 ("Robins Employment Agreement"). Fenwick did so on or around May 2, 2025 ("Fenwick Employment Agreement").

7

32.     Plaintiff Robins started as CEO of Instant Pot on January 2, 2024, shortly after the Company's carve-out was completed.  She has nearly 20 years of CEO leadership in public and private branded consumer companies driving growth and transformation.  Over her two years as CEO, Robins took a carve-out brand from a previously bankrupt company and built it up as a growing, healthy, stand-alone business, and hired a new leadership team and worked with them to significantly improve the Company's position by reducing total fixed expenses by over 40% (compared to the "pro forma" cost structure she inherited as a result of the carve-out) via continued reorganizations and reduction of fixed operating expenses.

33.     During her tenure as CEO, commercial successes for Instant Pot followed—the Company returned to number one market share position in the One Pot cooking category by mid-2025 and enjoyed two consecutive years of market-leading topline revenue growth driven by innovation and distribution expansion under her leadership. Gross margin profitability also improved significantly through her well-executed supply chain consolidation. As a result of the topline growth and significant cost reductions, bottom line profitability stabilized and expanded faster than topline.

34.     Ultimately, Robins led a strong leadership team who continuously achieved successful outcomes and produced a consistent record of strong commercial performance, improving the Company's overall position.

35.     Plaintiff Fenwick started working for Instant Pot in May 2025.  Prior to Instant Pot, Fenwick had worked for several public Fortune 500 and private equity ("PE") owned companies, helping them to navigate successful business and debt restructurings, including the sales of certain businesses.  He has significant experience in working with PE sponsors, lenders, third party debt advisors, and third party legal counsel when leading companies through debt restructuring.

8

36.    Upon joining Instant Pot, Fenwick quickly realized that the business was short on cash and immediately developed a new cash forecasting and management system for the company. Within the first month of his employment, Fenwick developed and implemented the financial statement and loan covenant compliance reporting required by Lender, which had not previously been adhered to (as Centre Lane knew—in fact, Defendant Singh, via email and verbally, expressed a lack of concern that Instant Pot had not been producing the required Lender reporting, which could have triggered a default of the credit agreement).

37.    In August 2025, Fenwick worked with Lender to implement an official short-term liquidity solution to navigate the cash constraints impacting the business. Separately, Fenwick introduced and led a project for Instant Pot resulting in a successful exit of a multi-year lease, which saved Instant Pot millions over the course of several years.  Neither the Company nor Centre Lane had a solution for this lease prior to speaking with Fenwick, which was causing a significant devaluation of the Company.  In addition to Fenwick's focus on the financial reporting and cash needs of the business, he led both the IT and Operation teams for Instant Pot as part of the Company's successful improvements to their metrics.

38.    Despite this performance on the part of Plaintiffs, Defendants refused to honor the terms of their employment agreements.

39.    A key provision for both Plaintiffs was the Company's agreement to award them options.  Both were provided the opportunity to purchase a certain percentage of equity of Instant Pot under a subsequent award agreement.

40.    As discussed below, while Robins has completed the options paperwork, Instant Pot inexplicably ignored repeated requests from Fenwick to sign the award agreement promised

9

by his contract. To date, the Company has never provided Fenwick with the award agreement he demanded to sign (or a justification for failing to do so).

41.    Among the other contractual protections important to both Plaintiffs were the protections from personal liability.

42.    The Company also agreed to indemnify Robins and Fenwick to the fullest extent possible against all reasonably incurred expenses, liabilities, and losses stemming from their employment.

43.    The employment agreements further provide for advancement of legal expenses incurred by officers during the pendency of a proceeding.

44.    As discussed below, the Company is refusing to indemnify Plaintiffs and advance legal fees they have incurred, and continue to incur, "by reason of" their service as officers.

**B.    Instant Pot Enters into an Accounts Receivable Factoring Agreement with Non-Party Lender to Finance Working Capital.**

45.    Instant Pot entered into an agreement with Lender, wherein Instant Pot financed working capital by selling receivables to Lender at a discounted price ("the Factoring Agreement").

46.    As such, when Lender buys a receivable and a customer subsequently pays Instant Pot for the related invoice, that cash received must be remitted to Lender on a weekly, predetermined basis. As the funds belong to Lender, they cannot be used for other purposes, such as operating expenses.

47.    Typically, customer payments go into a custodial account, which Instant Pot would wire to its rightful owner, Lender, at weekly intervals, consistent with the terms of the Factoring Agreement.

48.    Since Instant Pot's formation in November 2023, certain customer payments were made directly to a bank account of another Centre Lane portfolio company, Anchor Hocking. The

10

Anchor Hocking bank account used for Instant Pot customer receipts was a carryover account from the original organization structure prior to the creation of Instant Pot. The process of changing this depository account is complex and time-consuming due to customer and bank requirements, and thus was never fully completed for all customers, as all involved trusted the relevant contracts would be respected.

49.     Nevertheless, the cash being deposited into this account for payments made by Instant Pot's customers was generally for receivables factored (sold) to Lender. For over eighteen months, Anchor Hocking would transfer all cash deposits on a weekly basis to Instant Pot so that Instant Pot could remit the cash to Lender, the rightful owner of the funds.

50.     This process worked until the late summer of 2025, when Anchor Hocking stopped sending Instant Pot the incoming funds and instead began using them for Anchor Hocking's own operating expenses.

51.     The cessation of remittances from Anchor Hocking to Instant Pot coincides with events at Anchor Hocking highlighted in a lawsuit filed in New York Supreme Court (No. 650612/2026) by law firm Jones Day against Centre Lane, Anchor Hocking, and other related parties concerning unpaid legal bills. The suit alleges that the law firm was told by Anchor Hocking on September 15, 2025, that Centre Lane would not be helping with the company's cash situation; that Anchor Hocking needed to cover an $18 million gap in cash flow through year-end; and that Anchor Hocking was "spending more operationally than [it was] collecting from customers." (Compl. ¶ 113, *Jones Day v. Centre Lane Partners, LLC et al.*, No. 650612/2026 (N.Y. Sup. Ct. N.Y. County Feb. 3, 2026) NYSCEF No. 2.)

52.     In fact, far from aiding Anchor Hocking, Jones Day alleges that Centre Lane was taking money out of Anchor Hocking to repay a loan from Centre Lane, then distributing the money to Centre Lane insiders, including Singh and Morgan. (*See id.* ¶ 124.)

53.     As Anchor Hocking's CFO, Defendant Keller was the gatekeeper of these payments.  Despite knowing full well that Anchor Hocking was required to continue remitting cash deposits to Instant Pot, he joined the illicit scheme to keep these funds from being sent to their rightful owner, Lender, and instead used them for Anchor Hocking's operating expenses and to enrich Centre Lane and its owners.  On December 11, 2025, in an email to Keller, Robins made clear that there was no dispute to whom these funds belonged. Keller's only response was that Anchor Hocking had fallen behind on cash deposits and that Anchor Hocking needed the cash.

54.     As of January 16, 2026, Anchor Hocking was still holding a balance of approximately millions of cash belonging to Lender and Instant Pot to use for Anchor Hocking's own operating expenses.

**C.      Plaintiffs Repeatedly Express Concern About Instant Pot's Cash Position to Several Board Members, But Are Instructed to Withhold That Information from Both Its 30% Strategic Owner and Its Lender.**

55.     In the latter half of 2025, Instant Pot was dealing with numerous one-time cash issues, in part due to bond stacking, spikes in tariffs, and settlement payments.  These cash issues were all made at the direction of Centre Lane executives, and with full knowledge of the negative cash impact and the worsening cash position.

56.     These issues were detailed to Centre Lane, consistently and clearly, including in weekly calls that Instant Pot executives, including Plaintiffs, had with Defendant Ng (sometimes joined by Defendants Singh and Krause).  These cash flow issues were documented and raised with Centre Lane directly in e-mails on a regular basis.

57.     Plaintiffs' concerns were routinely brushed off by Defendants, including Ng and Singh.  Robins would repeatedly keep Krause informed of the Company's cash position as a matter of fiduciary responsibility, to which Defendant Krause frequently asked, "when will you run out of cash?"

58.     In mid-December 2025, Defendant Singh joined one of the weekly cash flow discussions and asked Plaintiffs when they expected the Company's cash situation to improve. When both Plaintiffs noted that the negative cash flow projections had been consistent for months, Defendant Singh expressed surprise but offered no support or solutions.

59.     On December 28, 2025, Plaintiffs met with Defendant Singh at his request. Plaintiffs grew concerned as it quickly became apparent that Defendant Singh failed to understand how the Factoring Agreement with Lender worked, including how the custodial account functioned and who owned what funds under the Factoring Agreement.  Later that day, Plaintiff Robins expressed these concerns on another call with Defendant Krause, who had also participated on the earlier call with Singh.

60.     On January 9, 2026, the Company was, for the first time, unable to make a full factoring repayment to Lender due to the cash stolen by Defendant Anchor Hocking as directed by Defendant Singh and executed by Defendant Keller.  The following day, Plaintiff Robins spoke with the Managing Director of Lender, who reiterated concerns over financial issues and the implications of Instant Pot failing to pay the outstanding amounts in full, especially as Instant Pot had just failed to make the full payment due to Lender the day before.

61.     Plaintiff Robins shared Lender's concerns in an email sent to Plaintiff Fenwick, Defendant Krause, Defendant Ng, Defendant Singh, and other members of Defendant Centre Lane.

13

62.   For example, on January 11, 2026, after the Company was unable to make the full factoring repayment to Lender, Plaintiff Robins summarized her phone conversation with Lender and informed Defendants Singh, Ng, and Krause that they needed to figure out payment options to complete the full repayment as soon as possible.  Defendant Singh responded that he also spoke with Lender, that "there is nothing to do other than make the payment that we reduced," and that Defendant Singh was unaware that Lender had "an internal reconciliation software that tracks the expected receipts[.]"

63.   On January 12, 2026, Defendant Ng asked for specific information to discuss a cash infusion with Defendant Morgan.  Plaintiff Robins provided the requested information and reviewed other relevant documents with Defendant Ng and Defendant Krause in subsequent conversations.

64.   Perhaps more disturbing than the lack of alarm about the Company's cash situation is that it appears to have been caused in part by Centre Lane's greed.  According to Jones Day's lawsuit, the cash problems afflicting Centre Lane's portfolio companies may have resulted from improper distributions to Centre Lane insiders.  The complaint alleges, for example, that Centre Lane took distributions "for the purpose of enriching Centre Lane and the individual defendants [including Singh and Morgan], while attempting to wrongfully shield the portfolio companies from payment of the Jones Day invoices." (Compl. ¶ 135, *Jones Day v. Centre Lane Partners, LLC et al.*, No. 650612/2026 (N.Y. Sup. Ct. N.Y. County Feb. 3, 2026) NYSCEF No. 2.)

65.   It appears that the genesis of the cash flow issues that Defendants sought to solve through theft and fraud was the looting of portfolio companies by Centre Lane and its leaders.

**D.      Singh Informs Plaintiffs That Anchor Hocking Will Send Instant Pot A Small Portion of Cash to Cover the Company's Operating Costs.**

66.      Over the course of a few months, Defendant Singh would direct funds to be moved from Anchor Hocking to Instant Pot to cover select expenses, such as one-time payments.

67.      On January 21, 2026, Defendant Singh e-mailed Plaintiffs that a small amount of the custodial funds received by Anchor Hocking would be sent to Instant Pot, allowing the Company to cover a missed settlement payment for a lease termination. However, it would still not cover the shortfall in the custodial account or any of the mounting past-due bills the Company was not able to pay due to the theft of Instant Pot's cash.  The next day, the small amount of custodial funds received by Instant Pot was the first payment received from Anchor Hocking in over nine weeks, showing the Singh, in collusion with Defendant Keller, were illegally controlling the flow of cash to Lender and Instant Pot.  This was but one example of Centre Lane disregarding the corporate form and improperly commingling the funds of independent portfolio companies.

68.      In a reply e-mail that same day, Robins expressed concern over this plan and noted that Instant Pot's cash position still would be insufficient to meet Instant Pot's operational needs. Fenwick agreed that Singh's proposal would not cover the outstanding cash flow issues.

69.      On January 22, 2026, Plaintiff Fenwick provided an overview of the debts owed by Instant Pot, including those owed to Lender under the Factoring Agreement, and shared the cash balances that Anchor Hocking had refused to return to Instant Pot.

70.      That same day, Defendant Ng spoke with Plaintiff Robins and told her that there would be no cash infusion to Instant Pot by Centre Lane.  When Robins expressed surprise, Ng responded that there were no solutions, that the conversation she had with Defendants Morgan and Singh went poorly, and that things were now all in Defendant Singh's hands.

71.      Defendant Ng proceeded to cancel the weekly cash flow call.

15

**E.      Singh Directs Plaintiffs to Misappropriate Custodial Funds to Cover Instant Pot's Expenses; They Refuse.**

72.      On January 23, 2026, Plaintiffs met with Defendant Singh and other Board members, reiterating that Instant Pot lacked the funds to make required payments to Lender under the Factoring Agreement, due to the cash that was not being remitted back to Instant Pot by Defendants Singh, Keller, and Anchor Hocking.

73.      Singh nevertheless directed Plaintiffs to use all existing Instant Pot cash, including custodial cash, to cover Instant Pot's operating expenses and to not pay Lender at all.

74.      Bewildered, Plaintiff Fenwick reviewed the Factoring Agreement after the meeting and confirmed that carrying out Defendant Singh's instructions to use funds in the custodial account held for Lender was not permitted under the terms and could be a criminal activity.

75.      That same day, Fenwick and Robins had a Microsoft Teams meeting with a managing director at Lender, in which Fenwick advised Lender that Instant Pot needed to preserve cash and would not be able to make the factoring payment owed to Lender.  Lender made clear that any money in the factoring account belonged to Lender; that Instant Pot's cash needs had nothing to do with its obligation to remit factored funds to Lender; and that it would be criminal theft if the Company were to use Lender's money for its own purposes.

76.      Plaintiffs refused to follow Defendant Singh's instruction to pay Instant Pot's vendors with Lender's money, knowing such action would be unlawful.

77.      On January 24, 2026, Plaintiffs met with Instant Pot's in-house counsel and brought her up to speed on the Factoring Agreement and Defendant Singh's unlawful instructions. Plaintiffs briefed Defendant Krause on the latest developments as well.

**F.      Singh Berates Plaintiffs for Not Participating in Defendants' Fraudulent Scheme to Steal Funds.**

78.      On January 24, 2026, after consulting with internal counsel and Robins, Fenwick sent another email stating clearly that he and Robins did not believe the solution to Instant Pot's cash problems was to raid the custodial account holding Lender's funds.  The email also noted that Anchor Hocking was not remitting Lender's funds to Instant Pot as required.

79.      Defendant Singh's aggressive response later that evening made clear that neither he—nor his co-conspirators Ng and Krause, copied on the email—had any concerns about siphoning funds to pay the Company's vendors. Singh told Plaintiff Fenwick that he had already told Lender that they would not be remitting funds to them as required under the Factoring Agreement, that "I HAVE ASKED YOU TO MAKE VENDOR PAYMENTS AS I LAID OUT," "I AM NOT ASKING FOR PERMISSION," "I AM NOT WORRIED ABOUT PAYROLL," and "NEXT TIME WE HAVE A CONVERSATION, I EXPECT YOU TO DO AS I SAY."

80.      But Singh's implication that Lender knew its funds were being used for Company purposes could not have been further from the truth.

81.      On January 25, 2026, the day after the above e-mail exchange, Defendant Krause expressed surprise to Plaintiffs about the escalating situation with Defendant Singh.

82.      On a call later that day concerning the 2026 budget (which, as discussed below, Defendants sought to manipulate), Plaintiffs and Defendants Krause, Singh, and Ng discussed Defendant Singh's email and the scheme to using factored funds to meet Company obligations.

83.      Plaintiffs again reiterated that it was illegal to use Lender's money for operating expenses.  Defendant Singh responded dismissively, claiming that "[Lender] won't do anything" and "the most [Lender] will do is send a letter."

17

84.     Singh did not care.  Nor did Ng or Krause, who are blindly loyal to Centre Lane and Singh.  Plaintiffs were again instructed to use Lender's money in the custodial account to pay Instant Pot's vendors.

85.     Plaintiffs again refused, noting the legal implications and pointing out that a potential event of default on Instant Pot's term loan with Lender would occur if the payments to Lender were not made.

86.     Defendant Singh responded by stating the Plaintiffs were on their own; that he did not care if there was a default; and that he would deal with the budget issues before dealing with Plaintiffs.

87.     Defendant Singh also stated that if Instant Pot wanted to obtain the cash owed by Anchor Hocking, Instant Pot would have to sue Anchor Hocking.  Once again, Centre Lane was abusing corporate forms across portfolio companies.

**G.     The Misuse of Lenders' Funds Was Part of a Broader Shell Game Across Centre Lane's Portfolio Companies.**

88.     Based on numerous interactions with Defendant Singh, it is clear he is controlling the use and movement of funds between portfolio companies.  In both conversations and email traffic, Defendant Singh has directed, and said he was directing, these activities.  Several other named Defendants, through email correspondence and meeting attendance, were fully aware of Defendant Singh's actions.  Examples include:

a.  Defendant Singh instructing Plaintiff Fenwick to make a settlement payment and to forgo paying another vendor even though Instant Pot does not have the cash to make the payment without shorting an upcoming payment to Lender.  The email shows Defendant Singh directing the funds flow from Defendant Anchor Hocking, who sent the money to the Company after Defendant Singh's instruction, marking

the first payment from Anchor Hocking to Instant Pot in over nine weeks, illustrating Defendant's Singh control of the funds from one portfolio to another.

b. Defendant Singh instructing Plaintiff Robins to pay a supplier of Instant Pot the day after failing to repay Lender, at a time when there was no operating cash available to cover the expense. Defendant Singh was fully aware that the only way this supplier could be paid was by using Lender's funds in the designated account, which would constitute a criminal act.

c. Defendant Singh unilaterally determining the use of funds and communicating directly with a Company supplier on the amounts that Instant Pot was going to pay them, after there was insufficient cash to fully repay Lender. Here, Defendant Singh inserted himself into the control of Instant Pot payments by communicating directly with the supplier. Further, as Instant Pot had no operating cash, Singh was demanding Plaintiffs use Lender's funds from the designated account.

d. Defendant Singh demanding the use of Lender's cash for operations in a precise manner. He was explicitly clear that he did not care that he was demanding Plaintiff Fenwick use the funds from Lender's designated accounts. As Instant Pot is the custodian of the designated account under the terms of the Factoring Agreement, it would be a criminal to use the funds as Mayank was directing.

89. Defendant Singh's conduct is particularly troubling, as it has now come to light that he and his co-conspirators were simultaneously negotiating to pay Jones Day $1.5 million—*potentially using factored funds that should have been remitted to Instant Pot*—to temporarily forestall the lawsuit discussed above that was ultimately filed on February 4, 2026.

90.     This pattern of behavior is evident across numerous portfolio companies controlled by Centre Lane and Mayank Singh, as evidenced on June 8, 2026, when Simply Interior Homes, another company owned by Centre Lane Partners, filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. *See In re Simply Interior Homes, LLC*, No. 26-10922-CTG (Bankr. D. Del. June 8, 2026).

91.     The allegations against Centre Lane—including refusal of Live Comfortably, another Centre Lane portfolio company and a sister company of Simply Interior Homes, to remit Simply Interior's customer receipts of up to $1.5 million per week to Simply Interior, and Centre Lane's refusal to provide necessary liquidity and capital support for Simply Interior—show the same type of conspiracy at work, which in this instance resulted in Simply Interior's bankruptcy. *See id.*, Dkt. 11, ¶¶ 9, 23.

**H.     Defendant Singh Instructs Plaintiffs to Overstate Instant Pot's Financial Metrics.**

92.     While the debate over stealing from Lender unfolded, Singh was working on another scheme to obtain a cash infusion for the Company.

93.     The Company's 2026 budget was solidified through a months-long process from September through December 2025.  During this period, Plaintiffs sent multiple budget decks to Defendants Ng and Krause and held numerous meetings with them to review the budget.  Plaintiffs also presented the budget to Singh, including in an email from Robins recapping the highlights.  On December 10, 2025, Singh signed off, stating that he "had no issues" with the budget.

94.     However, as the Company's cash issues came into real focus in January 2026, Defendants did an about-face.  During the week of January 19, Defendant Singh conferred with Defendant Morgan, then told Plaintiffs to create a new budget with an (unachievably) higher projected EBITDA.

95.     On January 25, 2026, Plaintiffs raised concerns about the budget Singh had demanded, sharing a presentation about the implications of various changes to the budget that would be required to raise the EBITDA projection.  Some cuts could be made in the budget previously approved by Singh, Krause, and Ng; several scenarios were presented with both the proposed budget cuts and the impact on the Company's overall financials and long-term business value.  ***Plaintiffs made clear that the EBITDA target, including punitive tariffs, that Defendant Singh sought was infeasible within the 2026 calendar year, even if it were achievable long term.***  As Plaintiffs explained and presented to Defendants, if significant changes to the budget were made in an effort to boost EBITDA, such as cuts to customer spending or new product development, there would be corresponding hits to topline elements of the business, hence reducing other EBITDA components.  During the call, Defendant Singh appeared to listen and discuss potential options.  Immediately after the conclusion of the meeting, Krause stated, "CLP will fund the business and your budget is approved."

96.     On information and belief, Defendant Singh was trying to doctor the financial projections to induce funding by—or a sale of the Company to—the 30% strategic owner that already had a stake in the Company.

97.     The member of the Board of Directors representing the stakeholder was conspicuously absent from all previous budget meetings attended by other directors—presumably because Defendants wanted to prevent it from learning of the true state of the budget.

98.     Centre Lane carefully controlled what financial information was shared with the 30% minority owner and Lender.  On prior occasions when the strategic owner requested financial information, Fenwick was told to share the information only with Centre Lane.  On information and belief, much of the requested information never made it to the 30% strategic owner.  Similar

21

requests from Lender for cash flow projections in early January were dismissed by Singh and Ng, given what they had known for months about the cash state of the business. For example, during a January 6, 2026, meeting, Lender made a clear request for a 13-week cash flow document; Plaintiffs were instructed not to give the information to Lender.

99.     Upon information and belief, once the Plaintiffs were removed from the Company, the Defendants, with their insertion of temporary Centre Lane employees into officer positions, created an unachievable budget. Upon information and belief, Defendants then presented this fictitious budget to the 30% strategic owner and were successful in fraudulently convincing them to commit additional investment dollars to Instant Pot. One of the primary reasons the additional cash infusion was needed by the minority owner was to cover Instant Pot's cash shortfall created by the Defendants' theft and misappropriation of cash from Instant Pot and Lender through Anchor Hocking. Through this fraudulent mechanism, upon information and belief, Centre Lane was effectively able to get the 30% strategic owner to fund operating expenses at Anchor Hocking, including any payments made by Anchor Hocking to Jones Day to delay their lawsuit against Centre Lane, Morgan, and Singh, among others.

**I.     Instant Pot Suspends Plaintiffs and Terminates Their Access to Company Systems in Retaliation for Refusing to Aid and Abet Defendants' Crimes.**

100.     By January 25, 2026, Defendant Krause—who is beholden to Singh and serves on at least three boards at Centre Lane's pleasure—had made ominous comments to Plaintiffs about what could happen if they crossed Defendant Singh.

101.     Shortly before the January 25, 2026, standoff where Plaintiffs refused to help Defendants steal Lender's money, for example, Krause asked Fenwick what he and Robins would do if Singh were to have them fired. Fenwick said he would view that as wrongful termination and act accordingly.

102.    Also leading up to, and on January 25, 2026, Plaintiff Robins had conversations with Instant Pot's Head of Human Resources detailing Defendants' actions.  The next day, Plaintiff Robins spoke with Human Resources again to file a formal ethics complaint about Defendant Singh's unlawful actions and the threat of adverse employment consequences for refusing to follow his directives.

103.    On January 26, 2026, Plaintiff Fenwick likewise reported to Instant Pot's Head of Human Resources that Defendant Singh was directing the illegal use of Lender's funds and threatening adverse employment consequences if Plaintiffs refused.  Plaintiffs have seen no indication that this report was taken seriously, let alone investigated.  To the contrary, the Company's purported "investigation" concerns Plaintiffs, not any Defendants.  It is clearly a pretext to justify the ouster of two executives who threatened to unravel Defendants' fraudulent schemes.

104.    Also on January 26, 2026, Lender served two notices of termination under the Factoring Agreement to Instant Pot, its directors, and Centre Lane.  One of the notices stated correctly that there had been an "***unlawful (and criminal) conversion of Collections by the Sellers' Parties at the direction of Mayank Singh***" and that the Company "ha[d] no right to remove funds from the Designated Account."

105.    On January 27, 2026, Lender served a Notice of Request for Books and Records to Plaintiffs Fenwick and Robins demanding a complete reconciliation of collections, remittances, and amounts deposited or held outside the designated custodian account, including amounts received by Anchor Hocking and not remitted.

106.    Plaintiff Fenwick forwarded the demand from Lender to Defendant Krause with Plaintiff Robins in copy.  Fenwick stated he was working to address the demand and that the

23

Company is required to provide the documentation, and full reconciliation of funds, to Lender as required by the Factoring Agreement. At this point Krause and, presumably, the other Defendants, were aware that their fraudulent scheme of stealing Lender's custodial funds would be made known to Lender.

107. Shortly thereafter, on January 27, 2026, Singh requested a call with Robins. Defendants Singh, Ng, and Krause were on the call and informed Robins she was being placed on leave pending an investigation. During the call, Defendant Singh further instructed Robins that she "cannot talk to Lender." Robins' access to all Company systems was terminated right after the conclusion of the call.

108. Defendant Krause then asked Fenwick to schedule a 1:30 p.m. call between them. Five minutes in advance of the scheduled call, Fenwick's access to all Company's systems was terminated.

109. For the scheduled call, Fenwick called Krause, who then dialed Singh into the call. Defendant Singh informed Fenwick that he was being suspended from the Company pending a purported investigation. Krause stated to Fenwick that he was not being terminated, but rather suspended with pay—perhaps in an attempt to avoid a wrongful termination claim by Fenwick, as this was mentioned by Fenwick on his January 25, 2026, call with Krause.

110. Subsequently, Plaintiffs received an email confirming their suspension and instructing them to cease all work on behalf of Instant Pot.

111. Immediately following Plaintiffs' suspensions, Centre Lane installed new executive leaders at Instant Pot. The initial CEO installed by Centre Lane was Defendant Krause and the CFO was a Centre Lane employee. Defendants also placed a commercial leader employed by Centre Lane as the President. Two weeks after Krause was named interim CEO, they reportedly

24

replaced Krause with another interim CEO, who has no prior experience with Centre Lane or the Company. This further demonstrates Defendants' attempts to cover up their fraudulent conspiracy and keep Lender in the dark about its stolen custodial funds by replacing leadership with employees who were loyal to Centre Lane or had no idea what had been occurring.

112. Other than vague allegations, through counsel, Plaintiffs have yet to be apprised of any findings from the purported investigation, let alone legitimate grounds for the adverse actions taken against them. Five months into their suspension, Plaintiffs were terminated **without cause**.

**J. Defendants Stonewall Plaintiffs' Demands for Information on their Suspensions, Books and Records, and Indemnification and Advancement.**

113. On February 8, 2026, counsel for Plaintiffs sent a letter to Instant Pot and its Board on behalf of Fenwick (a) demanding indemnification and advancement of his legal fees; (b) requesting documents and information concerning his suspension; and (c) instructing the Company and its Board to preserve documents.

114. The letter emphasized that "it is critical for Mr. Fenwick to understand the basis for his purported suspension from the Company and the termination of his access to all Company systems." Fenwick requested a written explanation of the basis for these actions and specification of what policy, procedure, or contract the Company believes he violated. The letter also requested copies of key documents, such as the Company handbook and the policies or procedures believed to be relevant to the suspension.

115. On February 10, 2026, counsel for Plaintiffs sent a similar letter on behalf of Plaintiff Robins to Instant Pot and its Board.

116. Defendants failed to respond to either letter.

117. After three weeks of silence, Plaintiffs' counsel sent another round of letters to Instant Pot and its Board on February 27, 2026. The letters emphasized that the "Company's

refusal to provide any information regarding the basis for [Plaintiffs'] suspension[s]—or the status of the Company's purported 'investigation'—leaves [Plaintiffs] in an untenable position. So too does the Company's refusal to even acknowledge [their] demand for advancement of legal fees."

118.   The letter also noted that the "Company's silence confirms the obvious fact that there is no legitimate basis for the disciplinary actions taken against [Plaintiffs]. These actions occurred on the heels of—and clearly in retaliation for—[Plaintiffs] raising concerns to the Company and Board about being instructed to engage in unlawful activities."[1]

**K.    To Further Conceal Their Crimes, Defendants Fire the Rest of Instant Pot's Leadership Team After Plaintiffs' Suspensions.**

119.   After Plaintiffs were suspended, the rest of the Company's leadership team was abruptly cut off from internal conversations and Board of Directors meetings.

120.   Plaintiffs learned that the rest of Instant Pot's leadership team was terminated from their positions on or around March 6, 2026. Commercially, to that point, the Company was performing well with strong sales growth, gross margin expansion, and profit improvement as it assumed a market-leading position. Given this strong performance, there was no legitimate basis for dismissing the entire leadership team.

121.   Upon information and belief, Defendants fired a majority of the remaining leadership team in an effort to cover up Defendants' illegal actions, as the team had close working relationships with, and potentially loyalty to, Plaintiffs.

---

[1] Counsel for all named Defendants eventually responded on March 6, 2026. However, subsequent discussions were unfruitful and offered no satisfactory explanation for Defendants' conduct. *See infra*, Section L.

122.   The leadership team was an experienced group of professionals from the appliance industry who consistently delivered success for Instant Pot and helped raise the Company's financial performance and strengthen the future of the business.

123.   Upon information and belief, Defendants replaced leadership positions with Centre Lane employees in a further effort to cover up Defendants' unlawful actions in committing fraudulent actions with respect to Instant Pot.

124.   Upon information and belief, no detailed information was provided to the remaining Instant Pot employees regarding the layoffs of the leadership team beyond a general explanation of seeking to cut costs and needed to restructure the Company.

### L.   Instant Pot Wrongfully Terminates Plaintiffs and Refuse to Acknowledge Defendants' Misconduct.

125.   On June 18, 2026, Defendant Krause called Plaintiff Robins to tell her that Defendants will not negotiate if Plaintiffs file suit, will "drag this out for years," will assert counterclaims against Plaintiffs that will not look good for their future employment prospects, and that Plaintiffs will rack up legal costs that include paying Defendants' attorney's fees in addition to their own.

126.   The next day, counsel for Defendants sent Plaintiffs' counsel Notices of Termination of Employment for both Plaintiffs.

127.   In the Termination Notices, the Company clarifies that the terminations of both Robins and Fenwick were "**without Cause**."

128.   While the Company's purported investigation has concluded, only sham findings have been provided to Plaintiffs, through counsel.  Plaintiffs have not been apprised of any legitimate grounds or cause for their terminations.

27

129.   Krause did mention on his June 18 call to Robins that Instant Pot had remedied their issues with Lender. However, this does not negate the criminal actions and instructions made to Plaintiffs prior to their suspension, nor the misuse of the funds that occurred.

130.   And no action by Centre Lane towards Lender could remedy that Anchor Hocking wrongfully took the Company's funds to cover its own cash, despite no justification or rationale for holding such cash.

131.   Further, Defendants, through counsel, have informed Plaintiffs that the Company is refusing to uphold their indemnification and advancement obligations.

### M.   Plaintiffs Are Severely and Irreparably Harmed by Defendants' Actions.

132.   Defendants' scheme has directly harmed Plaintiffs to the tune of millions of dollars.

133.   Putting aside the damages in connection with the refusal to honor their options, Plaintiffs will lose millions in lost income, as Defendants have caused substantial reputational harm to Plaintiffs and seek to effectively render them unemployable in their prime earning years (just as Defendant Krause threatened on his June 18 call with Plaintiff Robins).

134.   Being connected to the chaos at Instant Pot and underhanded dealings by Centre Lane undermines Plaintiffs' employment prospects.

135.   Moreover, separating from a PE portfolio company prior to the sale of the company or similar transaction is the career equivalent of a scarlet letter.  This is especially true for Plaintiff Fenwick, as he had been with the Company for less than one year.

136.   Since being wrongfully suspended, Plaintiffs have spoken with recruiters and other professionals to better understand their potential prospects in the market.  These discussions all confirm that there is no real prospect of finding a comparable role for either Plaintiff, especially if Defendants hold to their threats of destroying Plaintiffs' reputations.

137.    On top of that, Plaintiffs are being forced to incur significant legal fees, given the extended nature and non-responsive stance Defendants have taken over the last five months.  The Company is avoiding its indemnification and advancement obligations, leaving Plaintiffs to pay for their legal expenses out-of-pocket. Again, this is not a good-faith dispute over contractual obligations but part and parcel of Defendants' plan to drag this matter out and bury Plaintiffs in legal fees, as described by Defendant Krause to Plaintiff Robins on their June 18 call.

138.    Plaintiffs have suffered and will continue to suffer other harms discussed herein, including emotional distress.

## CAUSES OF ACTION

### COUNT I
### Violation of RICO (Racketeer Influenced and Corrupt Organizations Act),
### 18 U.S.C. § 1962 *et seq.*
### (Against All Defendants Except Instant Pot)

139.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

140.    Under 18 U.S.C. § 1962(a), it is illegal "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

141.    Under 18 U.S.C. § 1962(b), it is illegal "for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

29

142. Under 18 U.S.C. § 1962(c), it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ."

143. Each of Defendants Centre Lane, Instant Pot, Anchor Hocking, Singh, Ng, Morgan, Keller, and Krause is a "person" under 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

144. At all times relevant to Plaintiffs' RICO claims, Defendants Singh, Ng, Morgan, Keller, and Krause have been employed by and/or associated with Centre Lane, Instant Pot, and Anchor Hocking.

145. At all times relevant to Plaintiff's RICO claims, each of Centre Lane, Instant Pot, and Anchor Hocking has been an "enterprise" under 18 U.S.C. § 1961(4) because each is a corporation. Separately, Defendants have been operating an associated-in-fact enterprise: they created a structure to pursue the common purpose misappropriating funds and engaging in other illegal actions to inflate the financial position of Instant Pot and line their own pockets.

146. Centre Lane, Instant Pot, and Anchor Hocking engage in interstate commerce by operating their businesses nationwide. In addition, the wire transfers at issue, as well as the emails and other communications, occurred almost exclusively across state lines.

147. Defendants have engaged in countless acts of "racketeering activity"—and certainly more than the two acts required for a "pattern" under 18 U.S.C. § 1951(5)—as part of an ongoing scheme devised by Defendants. Among other crimes, Defendants conspired to commit numerous instances of wire fraud under 18 U.S.C. § 1343 by using the wire facilities as part of scheme to obtain, or attempt to obtain, money through false or fraudulent pretenses. Defendants

30

used wire facilities to enable the transfer and theft of monetary funds for improper purposes, including funds belonging to Lender—all while lying to Lender about what was happening with the money. The money was improperly used for Anchor Hocking's business and to enrich Centre Lane and its owners. In addition, on information and belief, Defendants have intentionally procured wire transfers from the 30% strategic owner and possibly others based on material misrepresentations and omissions about the Company's EBITDA projections.

148.   Singh—who has personally orchestrated the overall scheme—instructed Plaintiffs to misappropriate Lender's funds even after being specifically informed several times by Lender, Robins, and Fenwick that such actions would be unlawful, made many of the fraudulent electronic mail messages and calls, and ordered the concealment or omission of material information in effort to obtain investments or sales. In doing so, he has violated and continues to violate 18 U.S.C. § 1962(c) by engaging in a pattern of racketeering activity while "employed by or associated with" Centre Lane and Instant Pot and, alternatively, the associated-in-fact enterprise discussed above.

149.   Ng—who has participated in the conversations, phone calls, and electronic messages instructing Plaintiffs to misappropriate funds and was aware of the effort to conceal material information—has violated and continues to violate 18 U.S.C. § 1962(c) by engaging in a pattern of racketeering activity while "employed by or associated with" Centre Lane and Instant Pot and, alternatively, the associated-in-fact enterprise discussed above.

150.   Morgan—who has participated in the conversations, phone calls, and electronic messages instructing Plaintiffs to misappropriate funds and was aware of the effort to conceal material information—has violated and continues to violate 18 U.S.C. § 1962(c) by engaging in a pattern of racketeering activity while "employed by or associated with" Centre Lane and Instant Pot and, alternatively, the associated-in-fact enterprise discussed above.

151.    Krause—who has participated in the conversations, phone calls, and electronic messages instructing Plaintiffs to misappropriate funds and was aware of the effort to conceal material information—has violated and continues to violate 18 U.S.C. § 1962(c) by engaging in a pattern of racketeering activity while "employed by or associated with" Centre Lane and Instant Pot and, alternatively, the associated-in-fact enterprise discussed above.

152.    As CFO of Anchor Hocking, Keller was also a key participant in the illegal scheme and violated 18 U.S.C. § 1962(c): he controlled transfers of money from Anchor Hocking to Instant Pot, which transfers were a key component of the alleged fraud.  Further, Keller withheld Lender's and Instant Pot funds and performed racketeering activities by using those funds to electronically pay for Anchor Hocking's operating expenses.

153.    Plaintiffs' terminations were an integral component of Defendants' racketeering patten, and Defendants' decisions to remove Plaintiffs was coordinated and effectuated as part of, and in furtherance of, the racketeering enterprise's activities.

154.    The terminations were intended to conceal the enterprise's criminal predicate acts and ongoing fraud in an effort to preserve Defendants' ability to continue their scheme.

155.    Centre Lane violated 18 U.S.C. § 1962(a) by participating in the racketeering activities and using income from those activities to operate the enterprise.

156.     Anchor Hocking violated 18 U.S.C. § 1962(a) by participating in the racketeering activities and using income from those activities to operate the enterprise.

157.    All Defendants have worked in collaboration and by agreement to perpetrate the substantive RICO violations alleged herein, and thus all violated 18 U.S.C. § 1962(d).

158.    Defendants' RICO violations have directly and proximately caused—and continue to proximately cause—injury to Plaintiffs, because those violations have directly harmed Plaintiffs

as described herein, from costing Plaintiffs their jobs and stock options worth millions to damaging their professional reputations and ability to obtain further employment.

**COUNT II**
**Whistleblower Retaliation**
**(Against Defendants Instant Pot, Singh, Ng, Krause, and Morgan)**

159. Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

160. Defendants Instant Pot, Singh, Ng, Krause, and Morgan have violated and continue to violate numerous states' whistleblower protection statutes by engaging in acts described herein.

161. Plaintiffs are directly and foreseeably harmed by the adverse employment actions, including suspension and termination, against Plaintiffs in retaliation for engaging in the protected activity of reporting and objecting to unlawful activity.

162. By the acts described above, Defendants have violated statutes in Delaware (where the Company is incorporated), Illinois (where the Company is based), Florida (where Robins is based), and North Carolina (where Fenwick is based):

   a. Delaware's Whistleblowers' Protections Act, 19 Del. C. §§ 1701, *et seq.*, provides that "[a]n employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment, . . . .(3) Because an employee refuses to commit or assist in the commission of a violation, as defined in this chapter; or . . . (4) Because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur";

33

b.  Illinois's Whistleblower Act, IL ST CH 740 § 174/1, provides that "[a]n employer may not take retaliatory action against an employee for disclosing or threatening to disclose to any supervisor, principal officer, board member, or supervisor in an organization that has a contractual relationship with the employer who makes the employer aware of the disclosure, information related to an activity, policy, or practice of the employer if the employee has a good faith belief that the activity, policy, or practice violates a State or federal law, rule, or regulation";

c.  North Carolina General Statutes Annotated § 95-241 prohibits retaliatory action against an employee for engaging in protected activities, such as disclosing information related to an employer's unlawful conduct; and

d.  Section §§ 448.102 of Florida's Whistleblower Protection Statute provides, "[a]n employer may not take any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

163.  As detailed above, Plaintiffs were placed on indefinite suspension and immediately cut off from all Company systems, and ultimately terminated without cause, after they refused to follow instructions to (1) misappropriate Lender's cash for Instant Pot operating expenses, and (2) artificially inflate Company projections to fraudulently obtain cash infusions for the Company.

164.  Plaintiffs reported Defendant Singh's unlawful directives to Instant Pot's in-house counsel, as well as its head of human resources. Plaintiffs also raised their concerns with Company directors, including Defendants Krause and Ng.

34

165.    In retaliation for refusing to follow the unlawful instructions and for bringing reports of such unlawful directives to Instant Pot's attention, Plaintiffs were suspended and terminated in violation of various Whistleblowers' Protection Acts.

**COUNT III**
**Negligent Supervision**
**(Against Instant Pot and Centre Lane)**

166.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

167.    Defendant Instant Pot owed a duty to exercise reasonable care in ensuring the supervision of its managers, officers, and employees, including Defendant Singh who served on the Board of Directors, to ensure that Instant Pot officers and employees complied with the law and with Instant Pot's internal policies.

168.    In exercising reasonable care, Defendant Instant Pot knew or should have known that Defendant Singh was concocting unlawful or non-compliant conduct, including by directing Plaintiffs to commit illegal acts and subsequently punishing Plaintiffs for refusing to do so.

169.    Defendant Instant Pot breached its duties by, among other things: failing to train and supervise managers and officers, such as Defendant Singh, Ng, Krause, and Morgan, and other employees of Defendant Centre Lane regarding legal compliance and obligations; failing to monitor and correct known misconduct against employees and officers; permitting and ratifying unlawful directives issued to Plaintiffs; allowing Centre Lane's representatives to play shell games across its portfolio companies; and failing to prevent retaliatory adverse actions after Plaintiffs refused to engage in the illegal conduct and reported it.

170.    Defendant Instant Pot's negligent supervision was a direct and proximate cause of Plaintiffs' injuries, including Plaintiffs' wrongful suspension, emotional distress, reputational harm, and other damages.

## COUNT IV
### Unfair and Deceptive Trade Practices
### (Against All Defendants)

171.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

172.    Defendants have violated and continue to violate numerous states' unfair and deceptive trade practices statutes by engaging in the predatory and illegal acts described herein.

173.    Plaintiffs are directly and foreseeably harmed by Defendants' unfair and deceptive trade practices, and have suffered damages in an amount to be proven at trial.

174.    By the acts described above, Defendants have violated:

a.    Delaware 6 Del. C. §§ 2511, *et seq.*, which seeks to protect "consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State" by prohibiting "[t]he act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby";

36

b.      Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, which broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce";

c.      Section 349 of New York's General Business Law, which prohibits "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce", including deception, fraud, unconscionable and unfair commercial practices, misrepresentations and the knowing concealment, suppression, or omission of material facts with the intent others reply on such concealment, suppression, or omission, in connection with the sale or advertisement of goods'

d.      Florida's Deceptive and Unfair Trade Practices Act, Fla. State. Ann. § 501.201 *et seq.*, which seeks to protect "legitimate business enterprises" and prohibits "[u]nfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce"; and/or

e.      Section 75-1.1 of the General Statutes of North Carolina, which prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practice sin or affecting commerce".

## COUNT V
## Wrongful Termination
## (Against Defendant Instant Pot)

175.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

176.    A covenant of good faith and fair dealing was implied in Plaintiffs' Employment Agreements with Instant Pot.

177.    On numerous occasions, Plaintiffs raised concerns about Instant Pot's cash flow issues, including via email, weekly meetings, and conversations with Defendants.

178.    Plaintiffs also specifically stated that Defendant Singh's instructions to use Lender's money would be unlawful and a violation of the Factoring Agreement.

179.    In their roles as CEO and CFO, Plaintiffs were obligated to take actions in the best interests of Instant Pot and avoid placing the Company in legal jeopardy.

180.    Mere days after upholding those obligations in refusing to comply with Defendant Singh's illegal demands and informing HR of such conduct, Defendant Instant Pot "suspended" Plaintiffs "pending an investigation," and revoked Plaintiffs' access to all Company systems.

181.    Despite being required to provide Plaintiffs with written notice as to the event or condition constituting cause within fifteen days, as laid out in Plaintiffs' respective Employment Agreements, Instant Pot failed to do so.

182.    On June 19, 2026, Defendant Instant Pot formally terminated Plaintiffs' employment with the Company, without cause.

183.    Defendant Instant Pot wrongfully suspended and wrongfully terminated Plaintiffs in violation of public policy and in violation of the duty of good faith and fair dealing implied in Plaintiffs' employment contracts.

184.    The above-described conduct of Instant Pot—in suspending and terminating Plaintiffs—is wrongful termination under the common law of the State of Delaware.

185.    As the direct and proximate result of Instant Pot's wrongful suspension and termination, Plaintiffs have sustained severe emotional distress, losses of millions of dollars, damage to their professional reputation and careers, and harm to their ability to obtain new employment.  They also have needlessly incurred attorneys' fees and costs due to Defendants' misconduct.

## COUNT VI
### Tortious Interference with Contract
### (Against All Defendants Except Instant Pot, Anchor Hocking, and Keller)

186.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

187.    At all relevant times, Defendant Instant Pot was party to a valid and enforceable Employment Agreement with each Plaintiff.

188.    Other Defendants, led by Centre Lane and Singh, were aware of the existence and material terms of the Employment Agreement, and with such knowledge, intentionally and improperly interfered with the contract by the unlawful acts alleged above, which have resulted in Instant Pot breaching the Employment Agreements in numerous ways.

189.    These Defendants caused Instant Pot to breach the Employment Agreements by wrongfully suspending Plaintiffs and terminating their access to Company systems; withholding equity options owed to Plaintiff Fenwick; wrongfully terminating Plaintiffs' employment; and otherwise depriving Plaintiffs from further employment with the Company under the terms of the Factoring Agreement.

190. Defendants' interference was without justification and was undertaken with the plainly improper purposes of misappropriating funds, securing funding based on misrepresentations, and covering up crimes by, among other things, wrongfully instructing the Company to suspend Plaintiffs.

191. As a direct and proximate result, Plaintiffs were wrongfully suspended and terminated from their employment, locked out of their Instant Pot systems in an effort to cover up Defendants' acts, and suffered financial and reputational harm.

**COUNT VII**
**Breach of Contract (Options)**
**(By Plaintiff Fenwick Against Defendant Instant Pot)**

192. Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

193. Plaintiff Fenwick and Defendant Instant Pot entered into a valid and enforcement employment agreement on or around May 2, 2025.

194. Pursuant to this Employment Agreement with Instant Pot, Plaintiff Fenwick was provided an option to purchase a certain percentage of equity of Instant Pot, subject to a subsequent award agreement.

195. Fenwick requested the required award agreement multiple times from the Company, including in conversations with Defendant Ng. Plaintiff Robins also inquired with Ng about the situation. But the Company has completely ignored all requests from Fenwick and Robins for the Company to send Fenwick the award agreement and fulfill their contractual obligations to him.

196. Fenwick has been directly and proximately harmed by Instant Pot's actions preventing him from perfecting his rights under the Employment Agreement.

40

## COUNT VIII
### Breach of Contract (Failure to Advance Fees/Indemnify)
### (Against Defendant Instant Pot)

197.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

198.    As part of Plaintiffs' employment at the Company, Defendant Instant Pot agreed to indemnify Plaintiffs to the fullest extent possible upon request by Plaintiffs, including advancement of legal fees upon receipt of an undertaking.

199.    Plaintiffs have incurred, and continue to incur, substantial legal fees directly by reason of their service as Company officers.

200.    On February 8 and 10, 2026, counsel for Plaintiffs sent letters demanding, among other things, indemnification and advancement of legal fees along with the required undertakings from each Plaintiff.  Defendants failed to respond to the requests or otherwise confirm that they will adhere to their obligation to advance fees to and indemnify Plaintiffs.

201.    On February 27, 2026, counsel for Plaintiffs again sent another round of letters emphasizing the demand for indemnification and advancement, as well as any updates on the status of the "investigation."

202.    Despite their obligations of indemnification and advancement, the Company is refusing to indemnify and advance fees.

203.    The Company is also jeopardizing the required insurance they hold by refusing to provide indemnification.  The Company's Directors & Officers Policy states that Instant Pot must honor its indemnification obligations to the fullest extent permitted by law.

204.    The Company is further acting in bad faith by failing to indemnify Plaintiffs and advance them their reasonably incurred legal fees, despite their obligations to do so.

41

205.   This appears to be part of a general strategy to increase financial strain on Plaintiffs by dragging the matter out and burying them in legal fees as per Defendant Krause's threatening call to Plaintiff Robins on June 18, 2026.

206.   As a result, Plaintiffs have been directly and proximately harmed by having to pay legal fees from their own pockets and suffering emotional distress and uncertainty due to the Company's failure to adhere to its obligations.

## COUNT IX
### Breach of the Duty of Good Faith and Fair Dealing
### (Against Defendant Instant Pot)

207.   Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

208.   As stated above, Defendant Instant Pot's Limited Liability Company Agreement requires the Company to provide advancement and to indemnify their officers.

209.   Defendant Instant Pot is breaching the implied duty of good faith and fair dealing by refusing to even address Plaintiffs' demands for indemnification and advancement, let alone articulating a basis for not advancing fees.  Plaintiffs are being forced to pay for their legal fees out of pocket and are suffering emotional distress and uncertainty due to the Company's refusal to consider their demands for advancement and indemnification in good faith.

210.   Furthermore, Defendant Instant Pot has breached the duty of good faith and fair dealing inherent in the Employment Agreements by, among other things: (a) improperly suspending Plaintiffs in retaliation for reporting concerns about unlawful activities; and (b) refusing to provide any information or documents about the sham investigation concocted to justify the bad faith actions taken against Plaintiffs; (c) threatening to bury Plaintiffs in legal fees

42

and drag the case out for years if they refused to release their claims pre-suit; and (d) wrongfully terminating Plaintiffs without cause months after their indefinite suspension.

211.    As a direct and proximate result, Plaintiffs have suffered financial and reputational harm in an amount to be proven at trial.

## COUNT X
## Civil Conspiracy
### (Against All Defendants)

212.    Plaintiffs incorporate and re-allege each preceding paragraph as though fully set forth herein.

213.    Defendants engaged in a meeting of the minds in agreeing to act in an effort to misappropriate funds rightfully belonging to Lender.

214.    Defendants engaged in a meeting of the minds in agreeing to act in an effort to inflate the financial standing and EBITDA of Instant Pot in an effort to obtain investor funding in the Company and/or to obtain the sale of the Company.

215.    Defendants had a meeting of the minds in wrongfully suspending and terminating Plaintiffs and wrongfully terminating the entire leadership team of Instant Pot in an effort to cover up Defendants' unlawful actions.

216.    Defendants violated numerous state and federal laws, including various state whistleblower protection laws, various states unfair and deceptive trade practice statutes, as well as contracts with Instant Pot, in furtherance of their unlawful acts.

217.    Defendants took numerous steps in furtherance of such conspiracy by instructing Plaintiffs to take unlawful actions in an effort to misappropriate funds rightfully belonging to Lender and in inflating the financial standing of Instant Pots.

218.    As a direct and proximate cause, Plaintiffs were wrongfully terminated from their employment, locked out of their Instant Pot systems in an effort to cover up Defendants' acts, and suffered financial, reputational, and other harm.

### JURY DEMAND

219.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedures, Plaintiffs demand a trial by jury of all issues so triable that are raised here or which hereinafter may be raised in this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for a Judgment:

a.    Enjoining Instant Pot from engaging in further unlawful action and compelling it advance and indemnify Plaintiffs' legal expenses;

b.    Awarding compensatory damages in an amount to be determined at trial;

c.    Applying damages multipliers under RICO and/or other statutes invoked herein;

d.    Awarding punitive damages;

e.    Awarding attorneys' fees and costs under RICO and/or other applicable statutes; and

f.    Granting any other relief that the Court deems appropriate.

Respectfully submitted,

*/s/Margaret M. DiBianca*

| | |
|---|---|
| Aaron Lang | Margaret M. DiBianca (#4539) |
| (*Pro Hac Vice* application forthcoming) | Ann C. Cordo (#4817) |
| NELSON MULLINS RILEY & | DIBIANCA LAW, LLC |
| SCARBOROUGH LLP | 1201 N. Orange Street, Suite 504 |
| One Wells Fargo Center \| 23rd Floor | Wilmington, Delaware 19801 |
| 301 South College Street | T: (302) 268-8520 |
| Charlotte, NC 28202 | mdibianca@dibilaw.com |
| T: (704) 417-3012 | acordo@dibilaw.com |
| aaron.lang@nelsonmullins.com | |
| | *Attorneys for Plaintiff* |
| Dated: July 7, 2026 | |

44